EDWINA E. DOWELL, #149059
Assistant U.S. Trustee
NANETTE DUMAS, #148261
JOHN S. WESOLOWSKI, #127007
Office of the United States Trustee
U. S. Department of Justice
280 S. First Street, Suite 268
San Jose, CA 95113-0002
Telephone: (408) 535-5525
Fax: (408) 535-5532

Attorneys for Sara L. Kistler
Acting United States Trustee for Region 17

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>INTEGRATED PACKAGING ASSEMBLY CORPORATION, dba IPAC,<br><br>Debtor. | Case No. 07-53563 ASW<br><br>Chapter 11<br><br>Date: June 26, 2008<br>Time: 2:15 p.m.<br>Place: Courtroom 3020 |

## MOTION BY UNITED STATES TRUSTEE TO CONVERT CHAPTER 11 CASE TO CHAPTER 7

PLEASE TAKE NOTICE that at the date and time specified above, at the United States Bankruptcy Court, 280 S. First Street, San Jose CA 95113, the United States Trustee (the "UST") will, and hereby does, move the Court for the entry of an order to convert the above-captioned case to chapter 7 pursuant to 11 U.S.C. Section 1112(b).

In support of this motion the UST requests the Court to take judicial notice of its own records in this case. Fed. R. Evid. 201, made applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 9017. The declaration of Nanette Dumas (the "Dumas Decl.") is filed concurrently herewith.

### I. INTRODUCTION

Victor Batinovich, the responsible individual for debtor Integrated Packaging Assembly Corporation (the "Debtor"), wholly owns and controls the Debtor and has a

controlling interest in another non-debtor company, i2a. This case was filed in an unsuccessful last ditch attempt to halt the eviction of the Debtor from its leased business premises in San Jose. Following the eviction Batinovich filed a declaration with this Court in which he alleged that the Debtor was an operating semiconductor company with fifty-five employees, that the Debtor's assets had a liquidation value of $10 million - $15 million, and that the Debtor had suffered significant unspecified monetary damages in connection with the eviction because of the manner in which the Debtor's entire production line had been abruptly shut down. Batinovich told the same story under oath at the Debtor's initial Section 341 meeting. Subsequently, the Debtor filed schedules, signed under penalty of perjury by Batinovich, in which the Debtor scheduled, among other assets, "various" assets of "unknown" value in response to question 22 (patents, copyrights, and other intellectual property), question 29 (machinery, fixtures, equipment and supplies used in business), and question 30 (inventory) on Schedule B.

However, two months later Batinovich completely changed the entire story. At the Debtor's initial debtor interview ("IDI") he advised the UST that the Debtor had transferred all of its assets to i2a in early 2006, and that the Debtor was, in essence, an empty shell with some litigation claims of uncertain value. Batinovich told the UST that it was i2a, not the Debtor, that was the operating semiconductor business with all of the assets and the fifty-five employees. At the Debtor's continued Section 341 meeting Batinovich testified under oath that the new story was the true story. Subsequently, the Debtor filed an amended Schedule B changing the answers to questions 22, 29 and 30 to "none" and the value to "0," presumably to reflect the alleged transfer of all of those assets by the Debtor to i2a. At a recent Rule 2004 examination, Batinovich produced a signed copy of an asset purchase agreement between the Debtor and i2a and under oath he testified that the original story had been a mistake and that he had mis-spoken.

In the worst case, if Batinovich's original version of the story is true, then he committed perjury when he changed his story and testified under oath that the Debtor had transferred its assets to i2a, and he fabricated false evidence to support the lie. Since Batinovich owns and controls i2a, an obvious motive for this conduct would be his desire to benefit himself at the expense of the estate's creditors.

In the best case, Batinovich had such total disregard for the observance of corporate formalities that he made no mental distinction between himself personally, the Debtor, or i2a, and in addition he had such a poor memory that it took him more than sixty days into the case to recall that less than two years prior he had transferred all of the Debtor's business assets to i2a.

The grossly inflated valuation of the Debtor's business assets, discussed below, is another example of a false statement by Batinovich with respect to a material matter in this case. Whether he is deliberately lying or is merely profoundly distracted or confused, Batinovich's track record demonstrates that he should not remain in control of the Debtor.

Most importantly, given Batinovich's 100% ownership interest in the Debtor (the alleged transferor of all of the Debtor's assets) and his controlling interest in i2a (the alleged transferee of all of the Debtor's assets), he is simply not the proper party to objectively investigate the facts and circumstances regarding this alleged transfer, because it inures to his great personal advantage to have i2a retain all of the Debtor's assets and to have the Debtor remain as a non-operating empty corporate shell. This conflict of interest creates an appearance of self-dealing that cannot stand, even if Batinovich were to have the best of intentions and the highest degree of integrity.

This case should be converted to chapter 7 so that a neutral trustee can evaluate the alleged transfer of the Debtor's assets to i2a and objectively determine a course of action that is in the best interests of creditors and the estate.

Motion By United States Trustee To
Convert Chapter 11 Case To Chapter 7

Case: 07-53563    Doc# 99    Filed: 06/06/08    3    Entered: 06/06/08 16:11:56    Page 3 of 11

## II. DISCUSSION

### A. Factual Background

The Debtor filed a skeletal chapter 11 petition on October 31, 2007. On the first page of the petition, the Debtor checked the box to indicate that its assets were worth between $1 million and $100 million. The petition was signed under penalty of perjury by Batinovich.

The Debtor filed the petition in an attempt to halt an eviction from its business premises that was scheduled for the following morning. The eviction proceeded on November 1, 2007, however, despite the filing of the bankruptcy case. The Debtor was permitted to reenter the business premises after the eviction.

On November 2, 2007 the Debtor's landlord, Old Oakland Road Associates ("OORA") filed a motion for relief from the automatic stay and a motion to expedite the hearing. On November 8, 2007 the Debtor filed an opposition to both motions. Batinovich filed a declaration in support of the Debtor's opposition (the "Batinovich Decl."). In the declaration, Batinovich stated that he was directly involved with the Debtor's operation and maintenance of its business records. See Batinovich Decl., paragraph 3. He stated that the Debtor had fifty-five full time employees and a monthly payroll of approximately $150,000, and that the Debtor typically operated for sixteen hours per day. Id., paragraph 5. He stated that the Debtor had "significant assets" with a total replacement cost of $45 million and a liquidation value of between $10 million and $15 million, based on a valuation done within the last two years. Id., paragraph 7. He stated that the consequences to the Debtor of surrendering the business premises to OORA included: imminent and potentially permanent closure; significant loss of the Debtor's ongoing value; significant risk of falling out of compliance with existing contracts; loss of customers; loss of the very existence of the Debtor's business; layoffs of employees; cancellation of existing contracts; refusal of new business; and exposure to potential claims by customers. Id., paragraphs 19 - 20.

He stated: "The potential financial consequences of a forced surrender of the Premises. . . are so significant as to be a direct threat to the ability to continue as an ongoing concern and provide any recovery to creditors." Id., paragraph 20.

On November 28, 2007 the Debtor's initial Section 341 meeting was held. No IDI had been held yet, because the Debtor had not yet filed schedules, so the meeting went forward primarily for the purpose of accommodating any creditors who wished to appear and question the Debtor's responsible individual under oath. Batinovich was sworn in at the meeting. Dumas Decl., paragraph 2. On the record Debtor's counsel related the story of the Debtor's eviction from the Debtor's business premises notwithstanding the filing of the bankruptcy petition and the imposition of the automatic stay. Notably, Batinovich testified as follows regarding the difficulties of relocating the Debtor's business to new leased premises in Fremont:

> [B]ecause of the time constraints that we had to accomplish all this and facing another marshal shutdown, I had to personally hire a contractor, to the tune of about $700,000 to do the facilities, to work around the clock, Saturdays, Sundays, nights, just to get the job done, so that South Bay wouldn't lock us out. It is, at best, a nightmare, you know. In addition to employing a substantial number of people, we're trying to bring jobs back. The easiest thing for me was to really pack everything, ship it to Southeast Asia, like everybody else is doing, but this was definitely –- makes it difficult, not only for me, for us, but for the entire industry. This serves as a black mark to the entire semiconductor, high tech industry.

Dumas Decl., paragraph 3, Exh. A, pp. 9 - 10.

On November 29, 2007, the day after the initial Section 341 meeting, the Debtor filed Schedules A, B, D, E, F, G, H and a list of the 20 largest unsecured creditors. Debtor's schedule B included information that the Debtor owned "various" assets of "unknown" value in response to question 22 (patents, copyrights, and other intellectual property), question 29 (machinery, fixtures, equipment and supplies used in business), and question 30 (inventory).

The Debtor's IDI was held on January 8, 2008. Batinovich attended the IDI on behalf of the Debtor. On that occasion for the first time he advised the UST that he

1  was the 100% owner of a company called i2a,[1] and that the Debtor had transferred all
2  of its assets to i2a in early 2006.  Thus, the Debtor was not in fact an operating
3  business, the Debtor had no employees, and the Debtor's only remaining assets were
4  litigation-related claims and counterclaims of uncertain value.  Dumas Decl., paragraph
5  4.  The UST requested the Debtor to provide a copy of the asset purchase agreement
6  between the Debtor and i2a.  On January 24, 2008 the Debtor provided the UST with
7  an unsigned copy of the agreement, dated January 26, 2006.  Id., paragraph 5.

8       In the meantime, the Debtor's continued Section 341 meeting was held on
9  January 16, 2008.  Batinovich was sworn in at the meeting.  At the continued meeting
10 Batinovich confirmed the new version of events regarding the alleged transfer of the
11 Debtor's assets.  Dumas Decl., paragraph 6.  Batinovich testified as follows regarding
12 the remaining assets in the bankruptcy estate:

13      MS. DUMAS: Okay.  All right.  So what assets remain in the Debtor, IPAC, at this point?  That's probably the easier way of asking the question.
14      MR. BATINOVICH: Well, I guess the only thing that's pending over here is all these various lawsuits and whatever comes in and out of that.
15      MR. HEALY: To keep it simple for her and for everybody, are there any normal business visible assets that you think are still owned by IPAC?
16      MS. DUMAS: Inventory, equipment --
     MR. BATINOVICH: Nothing.  Nothing.  Zero.
17      MS. DUMAS: Okay.  So maybe some lawsuits, maybe as the plaintiff in a lawsuit, the right to recover.
18      MR. BATINOVICH: Right.

19 Dumas Decl., paragraph 7, Exh. B, pp. 10 - 11.

20      In addition, Debtor's counsel had a great deal of difficulty articulating the
21 underlying purpose of the bankruptcy case and, in addition, could only promise to
22 "clean up" the mess that the case was in at that juncture:

23      MS. DUMAS: Why does IPAC even need to exist?  (Laughing) You know, what's the purpose of IPAC at this point?  IPAC could just convert to a Chapter 7 and -
24      MR. HEALY: Well, it has to assert these affirmative claims to --
     MS. DUMAS: Because?
25      MR. HEALY: Because it has to assert the offset or affirmative claims against the obligations, otherwise the obligations remain.
26

---

[1] On other occasions Batinovich has represented that he has a majority or controlling interest in i2a, but not a 100% interest.

Motion By United States Trustee To
Convert Chapter 11 Case To Chapter 7

| | |
|---|---|
| 1 | MS. DUMAS: With?<br>MR. HEALY: Well, I believe the -- |
| 2 | MS. DUMAS: But it's a corporation that could just disappear.<br>MR. HEALY: Right. I believe that OSE is claiming that Mr. Batinovich is |
| 3 | obligated on the note along with his wife, and I believe --<br>MS. DUMAS: Did you personally guarantee anything? |
| 4 | MR. HEALY: No, but --<br>MR. GARCIA: I don't want to stop you, but we'll get to it. |
| 5 | (Laughter.)<br>MR. HEALY: But the same may apply to Old Oakland Road, although I don't |
| 6 | think they could assert that under the current facts. But I wouldn't put it past them. |
| 7 | MS. DUMAS: But I mean your only assets are these contingent unliquidated claims against these parties. It's all just speculative. The recovery is totally |
| 8 | speculative, and on the other hand, you've got all these parties with claims against this Debtor and this Debtor has got nothing, you know, except the claims against the |
| 9 | parties -- it's like a circle that kind of doesn't make sense. It's really -- I mean it just doesn't seem like -- is this really a good use of Chapter 11 to |
| 10 | use Chapter 11 to -- as a place to try to bring about a global settlement of claims in-between parties that, in the best case scenario, it sounds like they'll cancel each other |
| 11 | out. In the worst case scenario, these folks, these creditors will sue you -- sue IPAC and get nothing because IPAC's got nothing. In the best case, they sue and |
| 12 | you sue and you all, you know, you end up at zero. So --<br>MR. HEALY: The best case scenario is certainly IPAC comes out with a net |
| 13 | gain.<br>MS. DUMAS: How? |
| 14 | MR. HEALY: In my understanding of the lawsuits.<br>MS. DUMAS: But I mean even on this schedule here, I'm looking at 548 versus |
| 15 | 530, so a net gain of 18,000, using these optimistic figures that you've plugged in here. |
| 16 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 17 | MS. DUMAS: And Mr. Batinovich is going to have to pay for all of this, and from what revenues? There's no revenues from IPAC. So where's the money going to |
| 18 | come from?<br>MR. HEALY: Fortunately or unfortunately, I think most of the agreements all |
| 19 | have attorney fee provisions.<br>MS. DUMAS: Which agreements, or what agreements are you talking about? |
| 20 | MR. HEALY: The note, the settlement agreement/lease with all the prior landlords, so they may be self-funded in some sense. |
| 21 | MS. DUMAS: And if they're not, then what?<br>MR. HEALY: If they -- well -- |
| 22 | MS. DUMAS: Are you basically taking this on a contingent fee?<br>MR. HEALY: Well, I'm not -- |
| 23 | MS. DUMAS: I mean what -- well, what's your retainer?<br>MR. HEALY: Let's talk about that. |
| 24 | MS. DUMAS: How much was your retainer in the case?<br>MR. HEALY: I believe it was 40,000. |
| 25 | MS. DUMAS: And who funded the retainer?<br>MR. HEALY: I believe it was a combination of money from Mr. Batinovich and |
| 26 | i2A to IPAC to us, or that's the way I -- |
| 27 | MS. DUMAS: And who or what entity is going to continue to fund your fees, because 30,000 is a drop in the bucket. |
| 28 | MR. HEALY: Well, our involvement in the -- you know we budgeted our |

Motion By United States Trustee To
Convert Chapter 11 Case To Chapter 7

involvement –- I mean that's my job is to budget our involvement. Hopefully we'll fall within our budget.
  MS. DUMAS: Within the 30,000?
  MR. HEALY: I think it's 45.
  MS. DUMAS: And who's going to –- and who is going to be responsible for all of the attorney's fees, if you don't prevail in these lawsuits and get the recovery from the lawsuits themselves?
  MR. HEALY: I don't recall exactly how our fee agreement reads, but –-
  MS. DUMAS: I don't think we've seen your fee agreement, or did you give us the fee agreement but not the employment app or neither?
  MR. HEALY: No. I think –- I don't think Victor signed it at the last meeting.
  MS. DUMAS: Yeah, I think that's right.
  MR. HEALY: I know it's on my –- I know I have a draft, a copy on my desk.
  MS. DUMAS: That's kind of a big priority –-
  (Laughing.)
  MR. HEALY: Yeah, believe me I've –-
  MS. DUMAS: I mean right now –- how long –- when was this case filed?
  MR. HEALY: October 31st.
  MS. DUMAS: October 31st, and you haven't even been employed. You've been in the case for two and a half months.
  MR. HEALY: I understand that it hasn't been done.
  MS. DUMAS: That's just crazy. It's crazy. And then you've got this –- Brad Jones operating out there as if there's no bankruptcy going on. How's he going to get paid? What if he –- what if he works a miracle and settles this whole thing, and the case is in bankruptcy. He can't get paid by IPAC. Who's going to pay him?
  MR. HEALY: We're just going to have to work that out. He also represents the Batinoviches. So I don't know what his fee agreement reads.
  MS. DUMAS: I mean every –- you know, this is so –-
  MR. HEALY: It'll be cleaned up.
  MS. DUMAS: This is so not cleaned up right now.

Dumas Decl., paragraph 8, Exh. B, pp. 27 - 29; pp 30 - 33.

On January 25, 2008 the Debtor filed an amended Schedule B, signed by Batinovich under penalty of perjury, in which the Debtor changed the answers to questions 22, 29 and 30 to "none" and the value to "0," presumably to reflect the alleged transfer of assets from the Debtor to i2a.

On January 25, 2008 the Debtor also filed an amended Schedule F in which the total amount of general unsecured claims was changed from $20,009, as set forth on the original schedule F, to $38,001. (However, the filed general unsecured claims to date total $919,040.18; in addition, creditor OSE USA, Inc. has filed a secured claim of $1,028,133.12.)

At a Rule 2004 examination held on April 29, 2008, Batinovich testified under

Motion By United States Trustee To
Convert Chapter 11 Case To Chapter 7

8

Case: 07-53563 Doc# 99 Filed: 06/06/08 Entered: 06/06/08 16:11:56 Page 8 of 11

oath regarding his declaration signed on November 8, 2007. During his examination Batinovich admitted on numerous occasions that, as he put it, he had mis-spoken or made a mistake as to virtually all matters in his declaration that were arguably material, such as the fact that the Debtor did not have the books and records of the business in its possession, the Debtor had not been an operating business since early 2006, the Debtor had no employees, no inventory, no equipment, etc. Dumas Decl., paragraph 9.

When asked specifically about the estimated liquidation value of the Debtor's assets of $10 to $15 million, Batinovich answered, "Possible, yes. . . .Depends where in the world." Dumas Decl., paragraph 10.

The Debtor had produced copies of its corporate tax returns from 2003, 2004, and 2005 in connection with the Rule 2004 examination. Dumas Decl., paragraph 11. The UST is informed and believes that the Debtor still has not filed its 2006 and 2007 tax returns.[2] Id. The Debtor's 2005 federal tax return was dated July 14, 2007, which is *less than four months prior to the date of Batinovich's November 8, 2007 declaration*. Nevertheless, on that tax return the Debtor valued its assets at only $1,128,972 – a far cry from the $10 to $15 million valuation stated by Batinovich in his declaration. In addition, the Debtor had valued its assets at $1,103,160 on its 2004 federal tax return (dated September 20, 2005) and at $1,270,477 on its 2003 federal tax return (dated September 14, 2004). Id. When subsequently asked how he had arrived at the liquidation value of $10 to $15 million, Batinovich admitted, "Again, as I stated earlier, I talked about if it was an ongoing business, not necessarily in this part of the world. I pulled it out of the air." Later in the examination with respect to the valuation of $10 to $15 million he admitted, "I mis-spoke, as I have on several other occasions, counsel." Id.

---

[2] If the Debtor had timely filed its 2006 tax return, the Debtor could have produced the return as evidence to verify its story that the Debtor had transferred its assets to i2a in 2006.

Motion By United States Trustee To
Convert Chapter 11 Case To Chapter 7

**B. Legal Argument**

Section 1112(b) of the Bankruptcy Code provides in pertinent part:

[O]n request of a party in interest or the United States Trustee . . ., and after notice and a hearing . . . the court shall convert a case under this chapter to a case under chapter 7 of this title or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b) (Thomson West 2008).

The factors enumerated under "cause" in section 1112(b) are not exhaustive, and a "court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." In re Consolidated Pioneer Mortg. Entities, 248 B.R. 368, 375 (9th Cir. BAP 2000), affd., 264 F.3d 803 (9th Cir. 2001) (cite omitted).

There is cause for conversion of this case to chapter 7. When this case was filed, it appeared that creditors had a good source of recovery, because the Debtor had substantial assets and an operating business. Two months later creditors were advised that instead the Debtor's valuable business assets all belonged to another entity wholly controlled by Batinovich, and that there would be no source of recovery unless the Debtor – which has no cash – could bring funds into the estate by litigating various causes of action of unknown value against the creditors themselves. A neutral and objective chapter 7 trustee is the proper party to investigate the alleged transfer of assets, sue to avoid the transfer if the evidence supports such an action, and liquidate the assets for the benefit of the estate's creditors if the assets are recovered. See Matter of Fiesta Homes of Georgia, Inc.,125 B.R. 321, 325-326 (Bankr.S.D.Ga.1990) (case converted to chapter 7 when debtor failed to pursue recovery of preferential transfer to insider which was major source of recovery for creditors). See also numerous cases in which courts have appointed chapter 11 trustees due to potential or actual conflicts of interest between the estate and the debtor's management: In re Cajun Elec. Power Co-op, Inc., 74 F. 3d 599 (5th Cir. 1996), reh'g denied, 83 F. 3d 421

(5th Cir. 1996) (en banc), cert. denied, 519 U.S. 808 (1996); In re SunCruz Casinos, LLC, 298 B.R. 821 (Bankr. S.D. Florida 2003); In re Bellevue Place Associates, 171 B.R. 615 (Bankr. N.D. Ill. 1994); In re Nautilus of New Mexico, Inc., 83 B.R. 784 (Bankr. N.M.1988); In re William H. Vaughan & Co., Inc., 40 B.R. 524 (Bankr.E.D.Pa.1984); In re L.S. Good & Co., 8 B.R. 312 (Bankr. N.D. W.Va. 1980).

Conversion is a more appropriate remedy in this case than the appointment of a chapter 11 trustee because the Debtor is allegedly an empty corporate shell, and there is no ongoing business for a chapter 11 trustee to operate. In addition, conversion is in the best interests of creditors because it represents their only hope of getting paid.

### III. CONCLUSION

Based on the foregoing, the UST requests the Court to convert the case to chapter 7, or for such other relief as the Court deems just and proper.

Dated: June 6, 2008  Respectfully submitted,

By: /s/ Nanette Dumas
Nanette Dumas
Attorney for United States Trustee